In re Rozan E. CATER, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 03–BG–624.

District of Columbia Court of Appeals.

Argued June 17, 2004.

Decided Nov. 23, 2005.

4

Rozan E. Cater, pro se.

H. Clay Smith, III, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel at the time the brief was filed, was on the brief, for the Office of Bar Counsel.

H. Bradford Glassman, Washington, DC, with whom Elizabeth J. Branda, Executive Attorney, was on the brief, for the Board on Professional Responsibility.

Before TERRY, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Rozan E. Cater, an attorney who was admitted to the Bar of this Court in 1989, is the respondent in four consolidated disciplinary matters coming to us with a report and recommendation from the Board on Professional Responsibility.[1] In the first matter, a closely divided Board would absolve respondent of ethical misconduct in connection with her former secretary's embezzlement of over $47,000 from the estates of two incapacitated adults for whom respondent was the court-appointed guardian and conservator.

In the other three matters, the Board has found misconduct in respondent's repeated failures to cooperate with disciplinary investigations by Bar Counsel into ethical complaints against her. The Board accordingly recommends that respondent be suspended from practicing law for ninety days, with reinstatement conditioned on her compliance with Bar Counsel's investigative inquiries and on proof by respondent of her fitness to resume legal practice. Both Bar Counsel and respondent have objected to the Board's report.

With respect to the first matter, we disagree with the Board. We conclude that respondent violated two Rules of Professional Conduct: Rule 5.3(b), which required her to make "reasonable efforts" to ensure that the conduct of her nonlawyer employee was compatible with her own professional obligations as a lawyer, and Rule 1.1(a), which required her to provide competent representation to her wards and their estates. As to the three other matters, we agree that respondent violated Rules 8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority) and 8.4(d) (serious interference with the administration of justice), and D.C. Bar Rule XI, § 2(b)(3) (failure to comply with an order of the Board).

We suspend respondent for 180 days, attaching appropriate conditions to her reinstatement. One of those conditions is that respondent will have to prove that she is rehabilitated and fit to resume the practice of law. In the process, we grant the Board's request for clarification of the legal standard to be followed in deciding whether the so-called fitness requirement

---

1. We are informed that respondent has been suspended from the Bar since 2001 on account of her failure to pay her Bar dues. *See Sitcov v. District of Columbia Bar,* 885 A.2d 289, 2005 D.C.App. Lexis 529 (D.C.2005) (explaining administrative suspensions for nonpayment of dues).

is warranted. Resolving a disagreement between the Board and Bar Counsel, we approve the "clear standard" proposed by the Board: to justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record ·in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law.

## I. FACTS

■ The Board majority adopted the Hearing Committees' findings of fact in the four matters now before us *in toto.* In all material respects, the findings are unobjectionable, and for the most part they are undisputed. With respect to Bar Docket No. ("BDN") 337–99, however, we agree with Bar Counsel that the Hearing Committee made certain findings in this matter—we shall note them *infra*—that are "unsupported by substantial evidence of record." D.C. Bar R. XI, § 9(g)(1). Our analysis might not be materially different were we to accept these findings, but the point is one worth highlighting for future consideration by Hearing Committees and the Board. The findings in question relate to subjects that were within respondent's exclusive personal knowledge, such as her mental state and the arrangements in her law office, yet the Hearing Committee never heard from respondent, for she chose not to participate in the proceeding.[2] In lieu of receiving and evaluating her live testimony under oath, the Committee accepted at face value what respondent had written in defense of her conduct in pre-hearing correspondence with Bar Counsel and a pleading she had filed in Superior Court. This written material was not submitted to the Committee

by respondent; it was included in Bar Counsel's hearing exhibits, and Bar Counsel certainly did not vouch for its veracity. *Cf. Harris v. United States*, 834 A.2d 106, 117 (D.C.2003) (explaining that a party's submission to a tribunal of documents prepared by another may suggest adoption, if the submission truly manifests an intent to adopt or a belief in the truth of the statements contained in the documents). While hearsay is admissible in attorney disciplinary proceedings, findings of fact require a firmer foundation than a respondent's own uncorroborated, unsworn and uncross-examined assertions. When a respondent attorney has declined to subject herself to examination in the proper manner, at the proper time, before the proper tribunal, the self-serving claims she has made *dehors* the proceeding cannot be accepted if their credibility has not been established by other means. Any other rule would devalue Hearing Committee fact finding and undermine · public confidence in the legitimacy of Bar discipline. In this case, therefore, we conclude that respondent's self-serving written representations did not amount to "substantial evidence of record."

### A. Bar Docket No. 337–99

In BDN 337–99, Bar Counsel charged respondent with violating District of Columbia Rules of Professional Conduct 1.1(a) and 5.3(b) by failing to act competently and failing adequately to supervise a nonlawyer assistant in connection with respondent's service as court-appointed conservator of the estates of Charlie Mae Morton and Mary Virginia Hinton, two adult wards of the District of Columbia

---

2. Respondent absented herself from the hearing, without explanation, even though the Hearing Committee had granted her request for a postponement to afford her more time to prepare.

Superior Court.[3] The charges relate to two bank accounts that respondent opened, one at Riggs National Bank on May 4, 1995, and the other at First Union National Bank on May 31, 1996, to hold funds belonging to Ms. Morton and Ms. Hinton, respectively. Respondent was the only authorized signatory on the accounts. She drew upon them from time to time to pay her wards' living expenses. Unbeknownst to respondent, however, an employee in her office made a number of unauthorized withdrawals from the two accounts.

Over a nine-month period, from September 1995 to June 1996, respondent's secretary, Lena Summers, forged respondent's signature on thirty-four checks drawn on the Morton Estate account and embezzled over $42,000. One of the checks was made out to Nordstrom's; the rest were payable to Ms. Summers herself. In June 1996, Ms. Summers also forged respondent's signature on two checks drawn on the Hinton Estate account. One of the checks, in the amount of $3,000, was made payable to Charlie Mae Morton and was deposited in Ms. Morton's conservatorship account. The payee on the other check, which was for $2,150, was Lena Summers.

Both Riggs and First Union sent respondent monthly bank statements detailing the activity in the Morton and Hinton Estate accounts. These statements included copies of the checks drawn on the accounts and presented to the bank in the preceding month. Had respondent looked at the bank statements, she immediately would have discovered her secretary's defalcations.

Unfortunately, respondent did not look at the statements. She had delegated the task of reviewing the monthly bank statements for the Morton and Hinton Estates, and the other estates she administered as conservator, to Ms. Summers herself. For each estate bank account, it was Ms. Summers's responsibility to log in the monthly statements when they arrived in respondent's office, staple the enclosed checks to each statement, review each statement for discrepancies, verify the account balances, and file the statements. Evidently trusting her secretary to perform all these tasks honestly and accurately, respondent did not review the bank statements or otherwise check her secretary's work.

Respondent also assigned to her secretary the task of preparing the annual accountings that she had to file in Superior Court for the estates under her supervision. These accountings were to be based on the bank statements for estate accounts and other original financial records. Ms.

---

3. Before the Hearing Committee in this matter, Bar Counsel called the Register of Wills, Ms. Constance Starks, to describe the duties of court-appointed conservators. As she explained, a conservator is a fiduciary responsible for handling the financial affairs of a ward, "exercising the same degree of prudence and care that one would apply to [one's] own financial affairs." One of the conservator's duties is to file an annual report of all transactions on the ward's behalf for the court to review. Among other things, this annual accounting must list all disbursements from the ward's estate during the year and show the balance remaining in the estate at the end of the year. The task of preparing the accounting may be delegated, Ms. Starks testified, but the conservator remains responsible for supervising the work.

Ms. Starks further testified that if estate funds are held in a bank account, review of the bank statements is "one of the most critical aspects of the accounting." According to Ms. Starks, "[a] conservator should review bank statements each and every time they are received, much as an individual would review a bank statement that they [sic] receive monthly concerning their personal accounts." Ms. Starks agreed with Bar Counsel that the conservator should perform such reviews "personally."

Summers drafted a First Account for Ms. Morton's Estate at some point in mid–1996. This report covered the period May 3, 1995 to May 3, 1996, during which time Ms. Summers had negotiated all but three of the thirty-four forged checks drawn on the Morton Estate account. Although the First Account is not included in the record, there is no dispute that it did not disclose the unauthorized withdrawals made by Ms. Summers. In this instance too, as the Board found, respondent "appears not to have reviewed the primary-source financial documents—the monthly account statements—herself, but instead relied on Ms. Summers's (putative) distillations of the information in the statements." Not having checked it, respondent approved her secretary's dishonest work product and (allegedly) instructed her to file the First Account with the Superior Court. Ms. Summers evidently disobeyed that alleged instruction, for the First Account was not filed.

Relying on respondent's subsequent written explanations to the court and Bar Counsel of what went wrong, the Hearing Committee found that she "had observed her employee's work and competence for over a year, . . . had reason to trust her to do a good, and honest, job, [and] . . . did the training necessary to equip Ms. Summers to do the work she was assigned." Although respondent did make such claims (without, it is worth noting, elaborating on what they meant), they were entirely un-

substantiated. For the reasons previously stated, we reject these findings as unsupported by substantial evidence of record. The most that can be said is that Bar Counsel did not prove the contrary, that respondent had grounds to distrust Ms. Summers or failed to train her properly.

■ The Hearing Committee also credited respondent's written assertion that she kept the blank checks for her estate bank accounts in a locked safe in her office. This is another instance in which we think the Committee's finding is not supported by substantial evidence of record. More to the point, however, respondent admittedly knew, and yet professedly was not concerned, that the checkbooks were accessible to Ms. Summers.[4]

In early September 1996, Ms. Summers vanished. Respondent claimed that she filed a missing person report with the police on or about September 6 (but this claim is not corroborated; the putative report is not included in the record). Her secretary's disappearance did not cause respondent to suspect Ms. Summers of any wrongdoing, however, nor did it lead respondent to examine the bank statements that Ms. Summers had maintained.

Ms. Morton died on September 13, 1996. For more than a year afterward, respondent remained unaware of the missing and forged checks and the unauthorized withdrawals from the conservatorship accounts.[5] In late September 1997, the Su-

---

4. Respondent made this admission in her 1998 answer to the Superior Court's order to show cause why she should not be adjudged liable to Ms. Morton's Estate, which was the same document on which the Hearing Committee mainly relied in accepting respondent's self-serving assertions. Respondent stated:
 [T]he checks were kept in a safe place, and although she [Ms. Summers] had access to the checks, what could she do with them? She couldn't take them to Hechts and buy anything and surely she could not take a

check to the bank, and present it to a bank for cash without the bank verifying the signature.

5. According to her answer to the court's show cause order, secretaries she hired to replace Ms. Summers alerted respondent to serious problems with the Morton Estate account. Respondent simply refused to believe their multiple reports of discrepancies, and she continued to make no effort to examine the bank records herself:

perior Court notified respondent that the First, Second, and Final Accountings for the Morton Estate had not been filed and directed her to file them by October 3. This did not happen, and respondent received a second notification from the court in December 1997. In response to the notifications, respondent undertook to prepare the required accountings. For the first time, she reviewed the bank statements from Riggs. Seeing disbursements she did not recognize, she ordered copies of the checks from the bank (the forged checks evidently were missing from respondent's files). On December 24, 1997, respondent received the checks and at last discovered that Ms. Summers had forged her signature on them and embezzled Ms. Morton's funds.[6]

Respondent filed First, Second, and Final Accounts for the Morton Estate in January 1998. She reported the forgeries and unauthorized withdrawals by her secretary. In response, Superior Court Judge Cheryl M. Long ordered respondent to appear and show cause why she should not be removed as conservator and why she should not be held liable to the Estate. Judge Long noted that since respondent "was charged with the responsibility of safeguarding the Ward's assets," she "personally should have noticed that checks

were missing and used by someone other than herself." As the conservator and a fiduciary, Judge Long continued, respondent "should have had total control over the security of any blank checks, and should have taken action immediately upon seeing in any one bank statement that there were cancelled checks not written by her." Ultimately, after receiving respondent's written answer to the show cause order and holding hearings, Judge Long entered judgment in the amount of $42,003.19, plus interest, against respondent and her surety. The surety paid this judgment to the personal representative of the Morton Estate in August 1999.[7] Meanwhile, respondent applied to the court for compensation from the Estate for services rendered in the amount of $57,614. In a separate order, Judge Long denied this request in its entirety because of "the extraordinary scenario of [respondent's] lack of supervision" of her employee, Ms. Summers. Respondent's failure to notice Ms. Summers's forgeries reflected, Judge Long concluded, "significant inattention to the business of this estate."

On March 13, 2000, more than two years after she discovered the thefts from the Morton Estate, respondent notified a Probate Division auditor that Ms. Summers

---

The secretary that was then in the office [in mid–1997] had been trained to prepare Accountings, however, because she had not had much experience, when she informed me that she was unable to balance the account, I simply believed that it was her inexperience that was at fault. She was fired and another individual hired and trained to prepare Accountings and again the Morton accounting proved problematic. The secretary was attempting to work from the 1st accounting, of which I had a copy in the file, but was unable to find any of the same figures in the bank statements on hand. At that point, copies of the bank statements that were believed to be missing were ordered. Upon receipt of those state-

ments, the secretary was still unable to get the account to balance.

Thereupon, respondent stated, she "went through a wave of hiring and firing secretaries," which "only caus[ed her] to get further and further behind."

6. Respondent allegedly reported the matter to the police the same day. So far as the record indicates, Ms. Summers has never been found.

7. Respondent commenced a lawsuit against Riggs Bank, blaming it for honoring her secretary's forged checks. Reportedly, for reasons that have not been explained, this lawsuit was dismissed.

had forged her signature on two checks drawn on the Hinton Estate account. There is no explanation in the record for respondent's prolonged delay in reporting these forgeries and unauthorized withdrawals. The record also does not disclose whether respondent or her surety has reimbursed the Hinton Estate for its $5,150 loss.

### B. Bar Docket Nos. 139–01, 372–01 and 428–01

In each of three matters, Bar Counsel charged respondent with violating District of Columbia Rules of Professional Conduct 8.1(b) and 8.4(d) and D.C. Bar Rule XI, § 2(b)(3) by failing to cooperate with disciplinary investigations. The undisputed facts are as follows.

### 1. BDN 139–01

On March 30, 2001, Superior Court Judge Kaye Christian found that respondent had breached her fiduciary duties as court-appointed guardian and conservator for Ms. Hinton. Judge Christian removed respondent from the Probate Division's fiduciary lists and panels and referred her to Bar Counsel. The referral, docketed as BDN 139–01, alleged acts that may constitute misconduct under the Rules. On April 11, 2001, Bar Counsel sent the complaint of misconduct to respondent at her address listed with the District of Columbia Bar, requesting a response by April 23, 2001. On that date, respondent sent a facsimile informing Bar Counsel of her new mailing address[8] and requesting a thirty-day extension of time in which to respond to the complaint. The following day, Bar Counsel sent a letter to respondent at her new address by facsimile and by first-class mail, agreeing to her request

for an extension of time until May 23, 2001, to respond to the complaint.

Respondent did not submit her response by May 23, 2001. On May 31, 2001, Bar Counsel sent another letter to respondent at her new address, requesting her to respond to the complaint by June 5, 2001. No response was received, and Bar Counsel's letter was not returned. On July 26, 2001, Bar Counsel filed a motion with the Board on Professional Responsibility to compel a response to the complaint. A copy of the motion was mailed to respondent at her new address. No response was filed. On August 30, 2001, the Board issued an order compelling respondent to answer the complaint within ten days. The order was mailed to respondent at her new address. No response was received and the order was not returned.

As of the first scheduled hearing date, February 26, 2002, respondent still had not responded to the complaint or the Board's order. Respondent appeared at the hearing, however, and stated that she was not prepared because she had been through "an extensive amount of family hardship," including her own illness, that of both her parents, and the recent death of her father. The hearing was continued to March 28, 2002, at which time respondent signed a joint stipulation of fact regarding the history of her failure to respond to Bar Counsel's correspondence. The focus of the proceeding having shifted to respondent's non-cooperation with the investigation, the underlying complaint of ethical misconduct lodged by Judge Christian was not addressed at the hearing.

### 2. BDN 372–01 and BDN 428–01

On October 18, 2001, a member of the Bar of this Court filed another complaint

8. Respondent's new address was the same as her old address, except that her suite number had changed.

of ethical misconduct against respondent. Bar Counsel docketed the complaint as BDN 372–01 and sent it to respondent at her new address on November 1, 2001, requesting a response by November 13, 2001. There was no response, nor was Bar Counsel's letter returned. Bar Counsel sent a second letter on November 28, 2001, requesting a response by December 3, 2001. Again there was no response. On December 14, 2001, Bar Counsel filed a motion to compel a response with the Board, mailing a copy of the motion to respondent. Respondent did not answer the motion. On February 20, 2002, the Board issued an order compelling respondent to respond to the complaint within ten days. The order was mailed to respondent at her new address. Bar Counsel did not receive a response.

Meanwhile, on December 6, 2001, another member of the Bar of this Court filed an ethical complaint against respondent, which was docketed as BDN 428–01. After three mailings to respondent elicited no response, Bar Counsel again obtained an order from the Board directing respondent to respond to the complaint within ten days.

As she left the hearing in BDN 139–01 on March 28, 2002, respondent was personally served with the complaints, Board orders and other documents in BDN 372–01 and 428–01. Bar Counsel still received no answer from respondent. Thereafter, on August 1, 2002, respondent was personally served with the formal documents charging her with failing to cooperate in the two matters, which were consolidated. Respondent did not answer the charges, nor did she appear when the matters were heard before the Hearing Committee on September 18, 2002.

### 3. Post-hearing Proceedings

In October of 2002, respondent sent Bar Counsel a letter in which she denied "each and every allegation made against me" in BDN 372–01 and 428–01. Simultaneously, she requested a copy of the complaints "to enlighten me as to the allegations originally made." Respondent stated in her letter that until the previous week, she had not had "the mental or physical capacity to organize, respond or give great credence to the matters with which I have been entrusted." Bar Counsel forwarded this letter to the Board as additional evidence that respondent needed to prove her fitness to resume the practice of law. Respondent thereafter wrote to the Board to object to Bar Counsel's correspondence and demand "a full hearing on any suspension recommendation and representation by counsel." The Board treated this untimely demand as a motion to reopen the record and denied it for several reasons, among them that respondent had waived her right to contest Bar Counsel's positions.[9]

## II. DISCUSSION

■ The Hearing Committee in BDN 337–99 concluded that in relying on Ms. Summers to prepare an accounting and review monthly bank statements for the Morton and Hinton Estates, respondent did not violate either her Rule 1.1(a) duty to provide competent representation or her Rule 5.3(b) duty to make reasonable efforts to ensure that her nonlawyer assistant's conduct was compatible with her professional obligations as a lawyer. In its report to this Court, the Board on Professional Responsibility has agreed with the

---

9. The Board deemed it unnecessary to grant respondent a hearing to oppose Bar Counsel's claim that her letter indicated the need for a

fitness requirement because it declined to rely on the letter for that purpose.

**12**

Hearing Committee, over the dissents of four Board members who conclude that respondent did violate Rule 5.3(b). Bar Counsel takes exception to the Board majority's determinations and urges us to find that respondent violated both Rules. Whether the Board's determinations are characterized as findings of ultimate fact or conclusions of law, we owe them no deference; our review is *de novo*. *See In re Fair*, 780 A.2d 1106, 1110–11 (D.C.2001) ("we have the obligation to make our own determination on the issue").

In BDN 139–01, 372–01, and 428–01, the Hearing Committees and the Board have concluded unanimously that respondent's actions constituted a failure to respond to a lawful demand for information from a disciplinary authority in violation of Rule 8.1(b), a serious interference with the administration of justice in violation of Rule 8.4(d), and a failure to comply with an order of the Board in violation of D.C. Bar Rule XI, § 2(b)(3). Respondent has taken exception to these conclusions. Again, our review of the Board's conclusions is *de novo*.

As a sanction for the latter violations, the Board unanimously recommends that respondent be suspended from the practice of law for ninety days, with reinstatement conditioned upon full compliance with Bar Counsel's requests for information in the underlying disciplinary proceedings and proof of fitness to practice law. The dissenting Board members would have us suspend respondent for at least an additional ninety days for her Rule 5.3(b) violation. In reaching its recommendations, the Board has undertaken to clarify the standard it proposes to follow, in this and subsequent cases, for conditioning the reinstatement of a suspended attorney on proof of fitness. In order for it to suggest imposing a fitness requirement, the Board states, "the record in the disciplinary pro-

ceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law."

▉▉▉ Both respondent and Bar Counsel take exception to the Board's sanction recommendation. Respondent denies the need for a fitness requirement. Bar Counsel supports a fitness requirement but urges us to reject the Board's proposed new standard. Bar Counsel also suggests that we suspend respondent for nine months—three months for her failure to cooperate with Bar Counsel's investigations plus six months for her misconduct in connection with the Morton and Hinton Estates. In addition, Bar Counsel asks that restitution be made a further condition of reinstatement. The decision on sanction is committed, in the final analysis, to this Court's discretion. *In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987). In exercising that discretion, our policy is to "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g). The standard for imposing a fitness requirement is a legal question for the Court to resolve, however.

We reach the following conclusions. First, we agree with Bar Counsel and the dissenting members of the Board that respondent violated Rule 5.3(b). Second, we agree with Bar Counsel that respondent violated Rule 1.1(a) as well. Third, we agree with Bar Counsel and the Board that respondent violated Rules 8.1(b) and 8.4(d) and D.C. Bar Rule XI, § 2(b)(3).

Fourth, we choose to adopt the sanction recommended by the dissenting Board members: suspension from the practice of law for a total of 180 days, with reinstatement conditioned on a demonstration of full compliance with Bar Counsel's infor-

mation requests *and* proof of fitness. At Bar Counsel's suggestion, we also include a restitution requirement. In addressing the question of sanction, we agree with the Board on the desirability of a clearly articulated standard for imposing fitness, and we approve the formulation of that standard proposed by the Board.

We address each of the foregoing matters in turn.

## A. Rule 5.3(b)

■ Rule 5.3(b) provides that "[a] lawyer having direct supervisory authority over [a nonlawyer employee] shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." Explaining this obligation, the Comment to the Rule notes that "appropriate instruction *and supervision*" are necessary. D.C. Rules of Prof'l Conduct R. 5.3 cmt. (emphasis added). "The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline." *Id.*

■ The requirements of Rule 5.3(b) apply with full force to lawyers charged with the management of client funds. As stated in the Commentary to Rule 5.3 in the Annotated Model Rules of Professional Conduct:

> Courts view holding money in trust for clients as a nondelegable fiduciary responsibility that is not excused by ignorance, inattention, incompetence, or dishonesty. Although lawyers may employ nonlawyers to assist in fulfilling this fiduciary duty, lawyers must provide adequate training and supervision to ensure that ethical and legal obligations to account for clients' monies are being met.

ANN. MODEL RULES OF PROF'L CONDUCT R. 5.3 cmt. (5th ed. 2003) (Supervision of Trust Account Management) (quoted by the attached report of the Board on Professional Responsibility in *In re Gregory*, 790 A.2d 573, 578 (D.C.2002)). Thus, in this jurisdiction and elsewhere, violations of Rule 5.3(b) have been found where attorneys failed to discover and prevent misappropriation because they trusted nonlawyer subordinates to manage client funds and did not review bank statements or otherwise verify or check their subordinates' work. *See, e.g., Gregory*, 790 A.2d at 576–77, 579; *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 872 A.2d 693, 713 (2005) ("[H]ad the respondent exercised a reasonable degree of supervision over [his employee], he might have detected [the employee's] error before any ethical proscriptions had been violated under Rule 5.3.") (internal quotation marks and citations omitted); *In re Marshall*, 331 S.C. 514, 498 S.E.2d 869, 874 (1998) ("If respondent had properly supervised and monitored her office and her bank statements, respondent could have at least mitigated the damage . . . . [and] may have been able to prevent [the employee's] activities."); *State ex rel. Okla. Bar Ass'n v. Mayes*, 977 P.2d 1073, 1082 (Okla.1999) (lawyer's "almost total delegation" to his unsupervised employee of duty to account for entrusted funds "set the stage" for misconduct).

In the case now before us, Bar Counsel bore the burden of proving a violation of Rule 5.3(b) by clear and convincing evidence. *In re Mitchell*, 727 A.2d 308, 313 (D.C.1999). We think the evidence met that standard. Respondent assumed a fiduciary duty to monitor the funds in her wards' bank accounts. Such monitoring depended on reviewing the bank statements; there can be no dispute that "the regular and periodic review of the bank statements is a critical element of the

duties of an attorney who is charged with protecting and accounting for entrusted funds."[10] Respondent delegated this critical element of her duties to her secretary. This delegation was not necessarily impermissible in itself, even in combination with the admitted fact that respondent also allowed Ms. Summers to have unimpeded access to the checkbooks for the estate accounts. However, in entrusting the account reviews and related matters to her secretary, respondent instituted no internal controls, and she neither supervised Ms. Summers personally nor checked on whether Ms. Summers was doing her job correctly. In particular, even when respondent was required to account to the court for Ms. Morton's funds, she relied solely on her secretary's summaries without looking at the monthly bank statements herself to determine whether there were errors, unauthorized charges or other discrepancies that Ms. Summers had made or failed to catch.

To quote again from Board Chair Fort's dissent, "any attorney entrusted with the stewardship of estate assets who delegates to a non-lawyer a portion of the duty to monitor and account for the expenditure of entrusted funds does so at his or her peril if the attorney fails to conduct even a cursory review of the account balances on a periodic basis." Certainly respondent's total inattention to the bank statements, together with her failures to protect the checkbooks and to oversee her secretary's performance of her duties, had disastrous consequences. The lack of oversight and absence of security enabled Ms. Summers to perpetrate a brazen misappropriation of estate funds over a prolonged period of time without respondent taking the slight-

est notice. There would have been no misappropriation at all if respondent truly had secured the checkbooks so that her secretary could not gain unauthorized access to them; doing that would have been entirely feasible, since Ms. Summers had no authority to write checks on the estate accounts and hence no legitimate need to handle the checkbooks without respondent's knowledge. Further, even having access to the checkbooks, Ms. Summers surely would not have embarked on her embezzlement scheme, in which she wrote check after check to herself as payee with no effort at concealment for nine months, had she known that respondent would be reviewing the monthly bank statements (or adequately monitoring the status of the estate accounts in some other fashion). At a minimum, even though Ms. Summers was not deterred, she could have been stopped at any time during the nine month period with the least effort on respondent's part. A glance at any monthly account balance reported by Riggs Bank would have alerted respondent immediately that funds were missing from the Morton Estate account; the declining balance would have been a red flag, for respondent wrote only a handful of checks herself. A brief look at the transaction details contained in any monthly statement, not to mention the accompanying checks themselves, would have exposed the embezzlement scheme.[11] The monetary losses easily could have been reduced if not avoided entirely.

For these reasons, we think the evidence establishes clearly and convincingly that respondent did not "make reasonable efforts to ensure" that her secretary's conduct would be compatible with her professional obligations as a lawyer, as Rule

10. Our quotation is from the dissenting opinion in this case of then Board Chair Joanne Doddy Fort.

11. The statements listed the check number and dollar amount of each check, and flagged with an asterisk the out-of-sequence checks that Ms. Summers utilized.

5.3(b) required. So far as appears, respondent made no such efforts, reasonable or otherwise, after she decided to enlarge Ms. Summers's responsibilities.

The Board majority acknowledges that "[b]y entrusting Ms. Summers with the bookkeeping and not reviewing her work, Respondent placed great reliance on her trustworthiness." Conceding that such a delegation without effective oversight is an "adverse factor" in assessing a respondent's compliance with Rule 5.3(b), the majority nonetheless "decline[s] to conclude that prolonged reliance alone establishes a violation, particularly in view of the widespread, necessary, and justified reliance which lawyers and law firms place on in-house accountants, bookkeepers, secretaries, and administrative employees who have earned confidence, whether by professional accomplishment or accreditation, or simply competent and reliable work within an organization." To prove a violation of Rule 5.3(b), the majority therefore "would require additional showings such as a deficient [employee] selection process, inadequate training for the responsibilities given, inaction in the face of signs of untrustworthiness or dishonesty, or some other such conduct." The Rule 5.3(b) violation in *Gregory*, for example, was supported by evidence that the respondent attorney failed to supervise his assistant and verify her work "even after receiving notice that his assistant was writing unauthorized checks on the IOLTA account." 790 A.2d at 579. In contrast, the Board majority emphasizes, there is no evidence in the record of the present case that Ms. Summers "gave any indication of untrustworthiness or betrayed anything of her

ultimate, nefarious designs"; nor any evidence "to impugn" respondent's selection, evaluation or training of Ms. Summers before she entrusted her with bookkeeping duties for the conservatorships.[12]

Thus, the Board majority would not find a Rule 5.3(b) violation in a lawyer's failure to supervise or review a non-lawyer employee's performance of delegated responsibilities absent evidence that the lawyer had reason to believe the employee was untrustworthy or incompetent. We disagree with that position. In our view, a lawyer's failure to supervise or review an employee's work may contravene Rule 5.3(b) even if the lawyer does have reason to believe the employee is both honest and capable. "[R]easonable efforts to ensure" that an employee's conduct is compatible with the lawyer's professional obligations is a proactive standard that requires more than careful selection and appropriate training of the employee. As authoritative commentary to the Rule and case law make clear, proper supervision is necessary also. In important matters such as the maintenance of financial records for a conservatorship and the monitoring (or handling) of client funds, there must be some system of timely review and internal control to provide reasonable assurance that the supervising lawyer will learn whether the employee is performing the delegated duties honestly and competently or not. If no such system is in place, it will not do for a lawyer to profess ignorance of the employee's dishonesty or incompetence. Internal controls and supervisory review are essential precisely because

---

12. As previously mentioned, the Hearing Committee affirmatively found that respondent did have reason to trust her secretary's honesty and competence, and that she did train her secretary properly before delegating bookkeeping duties to her. Although we have concluded that these findings are not supported by substantial evidence of record, our analysis and disposition of this matter would be the same even if we were to accept them (as the Board majority did).

employee dishonesty and incompetence are not always identifiable in advance.

■ The type of controls and review required in any given situation will vary depending on the nature, extent and complexity of the delegated tasks; the experience, skills and training of the employee; the perceived or foreseeable risks and vulnerabilities; the circumstances under which the tasks are to be performed; the feasibility, cost and likely effectiveness of alternative internal control measures, and the overall work environment, among other factors. Responsible supervision does not mean that the lawyer must duplicate the employee's work or scrutinize and regulate it so closely that the economic and other advantages of the delegation are lost. Rule 5.3(b) requires "reasonable efforts," not overkill. Reasonable controls and review need not be overly intricate or unduly burdensome. In the present case, respondent was a sole practitioner who served as court-appointed conservator for the uncomplicated estates of several incapacitated individuals. In delegating account monitoring duties to her secretary, it would have been a simple matter for respondent to have maintained the checkbooks securely and to have reviewed the monthly bank statements periodically. Those two steps would have been effective; no more elaborate measures were necessary.

We hold that respondent violated Rule 5.3(b).

## B. Rule 1.1(a)

Rule 1.1(a) states as follows:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

"Competent handling of a particular matter includes . . . use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation, and continuing attention to the needs of the representation to assure that there is no neglect of such needs." D.C. Rules of Prof'l Conduct R. 1.1 cmt.

■ As we have concluded that respondent violated Rule 5.3(b), it follows *a fortiori* that respondent also violated Rule 1.1(a).[13] The same evidence supports both charges.[14] Respondent's representation

13. Conversely, having found no violation of Rule 5.3(b), the Board declined to find a Rule 1.1(a) violation for the same reasons.

14. In its brief to this Court, the Board argues that Rule 5.3(b) "preempts" Rule 1.1(a) in this case because the factual basis of the charged violations is the same and the Rule 1.1(a) charge "simply duplicates" the Rule 5.3(b) charge "at a higher level of generality." As explained in the "Scope" section of the D.C. Rules of Professional Conduct, "preemption" may occur where the lawyer's conduct is found to have complied with the more specific Rule:

In interpreting these Rules, the specific shall control the general in the sense that any rule that specifically addresses conduct shall control the disposition of matters and the outcome of such matters shall not turn upon the application of a more general rule that arguably also applies to the conduct in question. In a number of instances, there are specific rules that address specific types of conduct. The rule of interpretation expressed here is meant to make it clear that the general rule does not supplant, amend, enlarge, or extend the specific rule. So, for instance, the general terms of Rule 1.3 ["Diligence and zeal"] are not intended to govern conflicts of interest, which are particularly discussed in Rules 1.7, 1.8, and 1.9. Thus, conduct that is proper under the specific conflicts rules is not improper under the more general rule of Rule 1.3.

There is no preemption, however, where, as here, the lawyer is found to have violated the more specific Rule. In that case it remains appropriate to determine whether the lawyer also transgressed the more general Rule. So,

was deficient in the areas of thoroughness and preparation. In delegating her monitoring and accounting duties with respect to the Morton and Hinton Estates to her nonlawyer employee without proper oversight, respondent did not use procedures meeting the standards of competent practitioners. Respondent thereby neglected the needs of her clients for conservation of their assets, for she allowed the estates to be looted and failed to prepare and file a correct and timely accounting for the Morton Estate.

### C. Rules 8.1(b) and 8.4(d) and D.C. Bar Rule XI, § 2(b)(3)

 Rule 8.1(b) provides that "a lawyer in connection with a ... disciplinary matter, shall not ... knowingly fail to respond reasonably to a lawful demand for information from ... [a] disciplinary authority ...." Respondent's repeated failures to respond to letters from Bar Counsel and orders of the Board, which she received in three separate matters, unquestionably violated this Rule. *See, e.g., In re Beller*, 802 A.2d 340 (D.C.2002). For ignoring the Board's orders, respondent is also subject to discipline pursuant to D.C. Bar Rule XI, § 2(b)(3) ("Failure to comply with any order of the Court or the Board issued pursuant to this rule"). *See id.*

Under Rule 8.4(d), it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice." Respondent violated this Rule inasmuch as her conduct hindered the expeditious resolution of the allegations against her. *See, e.g., In re Lockie*, 649 A.2d 546, 547 (D.C.1994) (noting that "respondent's persistent and deliberate disregard of the repeated efforts

of Bar Counsel and the orders of the Board has ... prevented Bar Counsel from completing the investigation of the two serious charges which prompted this disciplinary proceeding").

### D. Sanction

 We turn to the matter of sanction with the dual recognition that "[t]he imposition of sanction in bar discipline cases is not an exact science," and that we owe respect to the considered judgment of the members of the Board. *In re Austin*, 858 A.2d 969, 975 (D.C.2004). We also recognize that, "[w]ithin the limits of the mandate to achieve consistency, each case must be decided on its particular facts." *In re Haupt*, 422 A.2d 768, 771 (D.C.1980). In all cases, the purpose of imposing a sanction is not to punish the attorney, but to protect the public and the courts, safeguard the integrity of the profession, and deter respondent and other attorneys from engaging in similar misconduct. *In re Pierson*, 690 A.2d 941, 948 (D.C.1997). Thus, broadly speaking, the factors to be considered in determining the appropriate degree of discipline include "the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts, and the legal profession, and the moral fitness of the attorney." *Austin*, 858 A.2d at 975 (internal quotation marks and citations omitted).

There are two parts to the question of sanction in this case. First, should respondent be suspended from the practice of law, and if so, for how long? Second, if respondent is suspended, what conditions should be imposed on her reinstatement; in particular, should she be required to demonstrate fitness?

---

for example, in a case in which we found a respondent to have violated Rule 1.3(a), we said it was "irrelevant" that the charge was "essentially duplicative" of other, more spe-

cific Rule violations that also were found. *In re Bernstein*, 707 A.2d 371, 376 (D.C.1998). *See also In re Drew*, 693 A.2d 1127, 1132 (D.C.1997) (appended Board report).

### 1. Suspension

■ The Board recommends that respondent be suspended *for ninety days for failing* to cooperate in three disciplinary investigations. As the Board notes, single instances of failure to cooperate typically have resulted in thirty-day suspensions, while multiple failures have elicited suspensions of *longer duration.* A ninety-day suspension is not inconsistent with the sanctions we have imposed in comparable cases. *See, e.g., In re Mattingly,* 790 A.2d 579, 580 (D.C.2002) (six month suspension imposed for failure to cooperate in three investigations, where respondent had been suspended thirty days for the same misconduct in a previous matter). We see no reason to disagree with the Board's recommendation on this point, and as neither Bar Counsel nor respondent herself takes issue with it, our deference to the Board is only increased. *In re Delaney,* 697 A.2d 1212, 1214 (D.C.1997).

There is no unanimity, however, as to the appropriate sanction for respondent's misconduct as conservator of the Morton and Hinton Estates. Having found no violations of Rules 5.3(b) and 1.1(a), the Board majority does not speak to the question. Respondent too does not address it. The four dissenting Board members recommend that respondent's suspension be lengthened by at least ninety days. On the other hand, viewing respondent's conduct as "akin to a negligent misappropriation of entrusted funds, in that through her negligence, two estates were looted by her employee," Bar Counsel argues that it warrants a six-month suspension (in addi-tion to the ninety-day suspension for failing to cooperate). A six-month suspension is "the norm" for attorneys who have committed negligent misappropriation. *In re Edwards,* 870 A.2d 90, 94 (D.C.2005).[15]

■ The analogy of respondent's misconduct to negligent misappropriation is imperfect. "Our disciplinary cases define misappropriation as 'any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use *for the lawyer's own purpose,* whether or not he [or she] derives any personal gain or benefit therefrom.'" *In re Anderson,* 778 A.2d 330, 335 (D.C.2001) (quoting *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983)) (emphasis added). This is not a case in which entrusted funds were used for the lawyer's own purpose. The salient and distinguishing feature of this case is the intervention of a dishonest third party who, disobeying respondent's directions and violating respondent's trust, used the entrusted funds for her own purposes. Moreover, respondent did not derive any personal gain or benefit from her inattentiveness to her employee's defalcations; on the contrary, in the Morton matter, at least,[16] respondent was heavily penalized by the probate court.

■ Since respondent's Rule violations were not trivial or merely technical, and since they were damaging enough to her vulnerable clients, we are satisfied that a suspension of some duration is warranted. However, while there are some other aggravating circumstances,[17] ultimately we

---

**15.** *Cf. In re Mulkeen,* 637 A.2d 1143, 1144 (D.C.1994) (stating, in a reciprocal discipline case, that neglect and failure to safeguard client funds "generally subjects an attorney to a suspension in the range of one year").

**16.** We have insufficient information regarding the court proceedings that occurred after re-spondent belatedly reported her secretary's unauthorized withdrawals from the Hinton Estate account.

**17.** We note in particular respondent's unexplained delay in discovering that the Hinton Estate had been invaded. We also note that respondent has a record of prior discipline:

are not persuaded to impose a longer period of suspension than the dissenting members of the Board recommend. We respect their "sense of equity in these matters." *Edwards,* 870 A.2d at 94 (quoting *In re Smith,* 403 A.2d 296, 303 (D.C. 1979)).

Accordingly, we shall order that respondent be suspended from the practice of law for a period of 180 days.

## 2. Conditions of Reinstatement— Cooperation, Restitution and Proof of Fitness

### a. Compliance with Bar Counsel's Requests for Information

▉▉▉ When we suspend a respondent for failure to cooperate with a disciplinary investigation, we normally condition reinstatement on a demonstration by the respondent of full compliance with Bar Counsel's requests for information regarding the underlying disciplinary complaints. We grant the unopposed request for that condition here.

### b. Restitution

As another condition of reinstatement, Bar Counsel asks us to require respondent to show that she has made restitution to the Morton and Hinton Estates, or to any surety that has reimbursed those estates on her behalf. D.C. Bar Rule XI, § 3(b), provides that we may require an attorney

to make restitution "either to persons financially injured by the attorney's conduct or to the Clients' Security Trust Fund (see Rule XII), or both, as a condition of probation or of reinstatement." For purposes of § 3(b), the term "restitution" means "a payment by the respondent attorney reimbursing a former client [or, where appropriate, the Clients' Security Trust Fund] for the money, interest, or thing of value that the client has paid or entrusted to the lawyer in the course of the representation." *In re Robertson,* 612 A.2d 1236, 1240 (D.C.1992).

▉▉▉ We shall require respondent to show proof that the Estates have been reimbursed, but not that she has repaid her sureties. Although a surety ordinarily has rights of reimbursement or other recourse against the primary obligor, *see generally* RESTATEMENT (THIRD) OF SURETY-SHIP AND GUARANTY §§ 22–24 ("Reimbursement") (1996), defenses are available, and the rights may be modified or limited by the terms of the suretyship contract. Respondent's contracts with her sureties, which are not included in the record before us, may or may not entitle them to obtain repayment from her. We doubt, moreover, that § 3(b) of D.C. Bar Rule XI was intended to authorize us to require such repayment in a disciplinary proceeding.[18] Respondent's sureties do not need our as-

---

she has received informal admonitions for violating Rule 1.3 (failure to act with reasonable promptness in representing a client), Rule 1.4(a) (failure to keep client reasonably informed and to comply promptly with client's reasonable requests for information), and Rule 1.5(b) (failure to provide client with a writing setting forth the basis for the fee).

18. We do not understand an attorney's bonding company to be in the same position as the Clients' Security Trust Fund, which exists to reimburse clients for "losses caused by dishonest conduct of members of the District of Columbia Bar, acting either as attorneys or fiduciaries (except to the extent to which they are bonded)." D.C. Bar R. XII, § 3. Unlike a commercial bonding company, which contracts to serve as an attorney's surety in exchange for a fee, the Trust Fund is created by Rule of this Court and is supported by appropriations from the District of Columbia Bar, *id.,* § 12. The Fund's rights of reimbursement against the errant attorney are not based on or subject to contract, but are as set forth in the Rule. *Id.,* § 13.

sistance in this ancillary proceeding to enforce their legal rights.

### c. Proof of Fitness—the Legal Standard

Turning to the main question, although the Board and Bar Counsel agree that respondent should be required to show proof of her fitness to practice law as a further condition of reinstatement, *see* D.C. Bar R. XI, § 3(a)(2),[19] they disagree on the proper rationale for such a requirement. The disagreement is understandable. With some degree of discomfort, perhaps, this Court has found itself admitting on more than one occasion that "we have not yet undertaken to enunciate a precise standard as to when a fitness requirement should be imposed." *In re Steele,* 630 A.2d 196, 201 (D.C.1993); *accord, In re Small,* 760 A.2d 612, 614 (D.C.2000); *In re Robinson,* 736 A.2d 983, 990 (D.C.1999); *In re Chisholm,* 679 A.2d 495, 503 (D.C.1996). The Board invites us—indeed, it urges us—to clarify the standard that should govern the imposition of a fitness requirement in this and future cases. The Board advances cogent reasons why clarification is desirable, and it has undertaken to develop and propose a particular standard for our consideration. Bar Counsel disputes the need for doctrinal clarification and opposes the Board's new standard.[20] We are aware that since the Board issued its report in this case, it has been using its

proposed test in deciding whether to recommend a fitness requirement in other cases involving suspension. Some of those other cases, in which Bar Counsel has jousted with the Board over what has come to be called the *Cater* standard, already have come before us. Until now we have found it unnecessary to settle the dispute between Bar Counsel and the Board.[21] But as the question has been percolating and will continue to be raised and fought over until it is resolved, and as the Board is telling us that it seeks our guidance in this area, we think the time has come for this Court to address the subject.

In lieu of stating a single test, past cases of this Court have phrased the question in different ways. In *Steele,* we conditioned reinstatement on proof of fitness because we could not be "reasonably assured" of the respondent's fitness to engage in the practice of law otherwise. *Steele,* 630 A.2d at 201. Alternatively, we imposed a fitness requirement in another case because we believed that the respondent's misconduct "cast[ ] serious doubt" on his ability to practice law ethically. *In re Siegel,* 635 A.2d 345, 346 (D.C.1993). In one recent case, we stated that the issue turns on whether "substantial questions remain" about respondent's fitness to practice law. *Robinson,* 736 A.2d at 990. We also have said that "where a respondent manifestly

---

19. D.C. Bar Rule XI, § 3(a)(2) provides that "[a]ny order of suspension may include a requirement that the attorney furnish proof of rehabilitation as a condition of reinstatement. In the absence of such a requirement, the attorney may resume practice at the end of the period of suspension without further order of the Court."

20. While respondent objects to a fitness requirement, she does not address the merits of the Board's suggested standard.

21. *See, e.g., In re Steinberg,* 864 A.2d 120, 122 n. 3 (D.C.2004) ("We express no opinion as to the appropriateness of the *Cater* standard, for we would impose the fitness requirement whether we were applying *Cater* or our own earlier case law on the issue."); *In re Mabry,* 851 A.2d 1276, 1278 n. 1 (D.C.2004) (accepting Board's recommendation of a public censure, to which Bar Counsel did not object, and hence not reaching the arguments addressed to the *Cater* standard for imposing a fitness requirement for reinstatement in the event we chose to suspend respondent).

has difficulty implementing necessary reforms," a fitness requirement may be necessary unless there exists a reasonably effective alternative means of protecting the public. *Edwards*, 870 A.2d at 97. Regardless of the phraseology, we often have found it useful to consider the same factors that guide us in determining whether to reinstate attorneys who have been suspended (or disbarred):

(1) the nature and circumstances of the misconduct for which the attorney was disciplined;

(2) whether the attorney recognizes the seriousness of the misconduct;

(3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones;

(4) the attorney's present character; and

(5) the attorney's present qualifications and competence to practice law.

*In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985); *see, e.g., Chisholm*, 679 A.2d at 503–04.[22] As the Board points out, however, these factors are not so helpful in failure to cooperate cases, wherein there may be no evidence as to any factor but the first. Particularly (but by no means exclusively) in failure to cooperate cases, our tendency since *Siegel* therefore has been to base the decision whether to impose a fitness requirement almost entirely on a comparison with similar cases. *See, e.g., In re Artis*, 883 A.2d 85, 95 (D.C.2005). As a result, "our focus has been 'upon the egregiousness of the attorneys' deliberate disregard

for the disciplinary process.' " *Id.* (quoting *Delaney*, 697 A.2d at 1214).

The Board persuades us that articulation of a clear standard for the imposition of a fitness requirement is desirable for a number of reasons. The inconsistency in our terminology risks confusing and obscuring the nature and purpose of the inquiry and the burdens of proof and persuasion. For example, *Steele*'s focus on whether we are "reasonably assured" that the respondent is fit (or will be fit after serving the defined period of suspension) suggests that it is the respondent who bears the burden of persuasion and proof, while our emphasis in *Siegel* on the existence of a "serious doubt" about the respondent's fitness implies that it is Bar Counsel who bears those burdens. That the conflict is real and not merely semantic is indicated by the disagreement between the Board and Bar Counsel in this very case: the Board favors the formulation in *Siegel* while Bar Counsel objects to that choice and prefers the articulation in *Steele*. The checklist of relevant factors drawn from *Roundtree* does not resolve the question; such a checklist is useful only if there is a standard to which the factors can be related. Nor is additional guidance provided by an "egregiousness" test. And as the Board emphasizes, "[t]o impose a fitness requirement based only upon a comparison of similar cases in the absence of a clearly articulated standard runs the risk of elevating the value of 'consistency' of our decisions over the paramount consideration—the objective to be achieved in imposing the requirement." [23]

---

**22.** As we explained in *Robinson*, "[i]n considering whether to impose a fitness requirement, the court has considered whether the passage of the suspension period alone, without further evaluation, will leave the court uninformed or concerned with respect to the enumerated [*Roundtree*] factors, thus indicating that substantial questions remain about

respondent's fitness to practice law." 736 A.2d at 990.

**23.** "Moreover," as the Board also points out, the search for consistency is, at times, an elusive undertaking. "The discipline which this court has imposed for violations of the same proscriptions has varied, for the sanc-

In settling upon an appropriate standard, the objective of the fitness requirement is clearly the place to start. The standard must correspond to and promote the objective. As the Board notes, the reason for conditioning reinstatement on proof of "rehabilitation," D.C. Bar R. XI, § 3(a)(2), is conceptually different from the reason for suspending a respondent for a period of time. The fixed period of suspension is intended to serve as the commensurate response to the attorney's past ethical misconduct. In contrast, the open-ended fitness requirement is intended to be an appropriate response to serious concerns about whether the attorney will act ethically and competently in the future, after the period of suspension has run. Primarily, "our concern is that [the attorney's] 'resumption of the practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest.'" *Steele*, 630 A.2d at 201 (quoting *Roundtree*, 503 A.2d at 1217); *see* D.C. Bar R. XI, § 16(d). "The license to practice law in the District of Columbia is a continuing proclamation by this Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and an officer of the court." D.C. Bar R. XI, § 2(a).[24]

█ Thus, while the decision to suspend an attorney for misconduct turns largely on the determination of historical facts, the decision to impose a fitness requirement turns on a partly subjective, predictive evaluation of the attorney's character and ability. (This is the reason hearing committees, the Board and this Court often have found it difficult to decide whether to recommend or impose a fitness requirement.) In practice, to be sure, the clear and convincing evidence that establishes the predicate violation of professional norms is usually much the same evidence that evokes doubts about the respondent's future fitness to adhere to those norms. That, of course, is why the question of fitness frequently arises in disciplinary proceedings. Nonetheless, proof of a violation of the Rules that merits even a substantial period of suspension is not necessarily sufficient to justify a fitness requirement,[25] while evidence of circumstances surrounding and contributing to the misconduct may be what tips the balance in favor of the condition.[26]

---

tion in each case necessarily turns on the particular circumstances." *In re Chisholm*, 679 A.2d [at] 503. *Accord, In re Lopes*, 770 A.2d 561, 572 & n. 7 (D.C.2001) (because "[n]o two cases are alike," Court finds Board's recommendation to not impose fitness requirement was reasonable and expressly states that it "do[es] not suggest . . . that a contrary recommendation would have been unreasonable"). Finally, as the number of decisions grows, the imposition of a fitness requirement solely by comparison with prior decisions will become unmanageable.

24. For a more extended discussion of the meaning of fitness, see *In re Dortch*, 860 A.2d 346, 355 (D.C.2004).

25. *See, e.g., Edwards*, 870 A.2d at 94 ("A six-month suspension *without a fitness require-*

*ment* is the norm for attorneys who have committed negligent misappropriation of entrusted funds together with the related violations (commingling, deficient record keeping) exhibited here.") (emphasis added).

26. *See, e.g., In re Lyles*, 680 A.2d 408, 419 (D.C.1996) (Board report) (imposing a fitness requirement where, among other things, the respondent was suffering from serious depression); *Steele*, 630 A.2d at 201 (imposing a fitness requirement in large part based on respondent's acknowledgment of unidentified personal problems that adversely affected her emotional stability); *see also In re Cooper*, 613 A.2d 938, 940 (D.C.1992) (imposing a fitness requirement on account of attorney's unresolved cocaine addiction even though the misconduct for which he was suspended was not attributable to his addiction). A finding of a

The standard also must be designed so as not to vitiate one of the most valuable tools in the disciplinary armamentarium. The length of a period of suspension reflects the gravity of the attorney's misconduct and is fixed with the aim of individual correction as well as general deterrence. Nonetheless, the period of suspension that may be justified in a given case of misconduct may not be enough by itself to protect the public, the courts and the integrity of the legal profession. The more unlikely it is that the attorney will be rehabilitated by the end of the predetermined suspension term, the more the need for additional protection. In such cases, the chief, if not the only,[27] means at our disposal is to require proof of fitness as a condition of reinstatement. We must take care not to erect unnecessary impediments to our resort to this remedy.

There is a countervailing consideration, however, that we cannot ignore. In fashioning the test for conditioning reinstatement on proof of rehabilitation, we must take into account the consequences for respondent attorneys. The fitness requirement can be a tail that wags the disciplinary dog. We are "reluctant" to impose it if the need is not amply demonstrated, "as that requirement may have the practical effect of greatly prolonging—even tripling or quadrupling—a respondent's period of suspension." *Edwards*, 870 A.2d at 97. As the Board report in this case helpfully explains:

> A suspended attorney required to prove fitness prior to returning to prac-

tice must obtain an order of reinstatement from the Court of Appeals. D.C. Bar R. XI, § 16. The standards and procedures are the same whether the attorney is disbarred or suspended. *Id.* The process begins with a petition for reinstatement to the Board. D.C. Bar R. XI, § 16(d); Board Rule 9.1. If the petition is neither insufficient on its face nor defective, it is referred to a Hearing Committee. D.C.Bar. R. XI, § 16(d). At the hearing, the suspended attorney has the burden to prove by clear and convincing evidence that he or she "has the moral qualifications, competency, and learning in law required for readmission; and [t]hat the resumption of the practice of law by the attorney will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." D.C. Bar R. XI, § 16(d). Following the hearing, a Report and Recommendation to the Board is issued. D.C. Bar R. XI, § 16(d). Next, the Board reviews the matter. If either the petitioner or Bar Counsel files exceptions to the Hearing Committee's Report and Recommendation, the Board accepts briefs from the parties and hears oral argument. It then issues a Report and Recommendation, which is filed with the Court of Appeals for final decision. If the Board's recommendation is opposed by either the petitioner or Bar Counsel, the Court allows further briefing before issuing its final decision. *Id.* § 16(e).

---

violation of the Rules of Professional Conduct on the basis of clear and convincing evidence is ordinarily a prerequisite to suspending an attorney, with or without a fitness requirement. However, an attorney who is shown to be currently incapacitated by mental infirmity or illness or addiction may be suspended for that reason alone. *See* D.C.Bar. R. XI, § 13. Our discussion in this opinion does not ad-

dress the proof requirements in such a nondisciplinary proceeding.

**27.** Reasonable alternatives should be explored in some cases. *See Edwards*, 870 A.2d at 98–99 (requiring a practice monitor as condition of probation in lieu of imposing a fitness requirement).

No one can mistake the burdens attendant to a reinstatement proceeding. These proceedings take approximately eighteen months, *In re Steele,* 630 A.2d [at] 201 n. 5,[28] but may take appreciably longer. *See, e.g., In re Brown,* 617 A.2d 194, 196 (D.C.1992) (disbarred attorney petitioned for reinstatement in 1987, denied in 1992); *In re Tinsley,* 668 A.2d 833, 834 (D.C.1995) (per curiam) (attorney suspended for one year in December 1990 denied reinstatement five years later). They involve three distinct proceedings before a Hearing Committee, the Board, and the Court of Appeals. Assistance of knowledgeable counsel is an obvious benefit and—equally obvious—it is costly. Represented or not, the petitioner will devote substantial time and energy to the process.

*See also In re Morrell,* 859 A.2d 644 (D.C. 2004) (describing contents of petition for reinstatement).

■ Because "an attorney's fitness to practice is a subjective evaluation," the Board would not require Bar Counsel to prove the attorney is, in fact, unfit to practice in order to justify a fitness requirement. Instead, balancing the competing considerations, the Board has concluded that "the most appropriate standard is whether there exists a 'serious doubt' of a respondent's fitness to practice law." This means, the Board explains, that to justify conditioning the reinstatement of a suspended attorney on proof of rehabilitation, "the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." In this formulation, the Board uses the term "doubt" to connote real skepticism, not "just a lack of certainty."

■ We approve the Board's proposed test. We agree, first of all, that imposition of a fitness requirement must be justified by evidence in the record of the disciplinary proceeding that calls the respondent's fitness into question. The burden of proof, in other words, belongs to the proponent of the sanction, *i.e.,* Bar Counsel. Second, we agree that Bar Counsel should be required to establish a "serious doubt" as to the respondent's fitness to practice law in order to justify conditioning the respondent's reinstatement on proof of rehabilitation. The "serious doubt" test is derived from, and is essentially consistent with, our precedents, including *Steele; Siegel* and *Robinson.* Requiring any greater showing would be impractical and would be insufficiently protective of the public, the courts and the legal profession. But if no serious doubt exists about an attorney's fitness, it would be unnecessary and unfair to augment the sanction of a limited period of suspension with such an onerous obligation. Any incremental benefits from a more unrestrained resort to the imposition of fitness conditions would be speculative at best.

Finally, we agree with the Board that the requisite "serious doubt" must be generated by evidence that is "clear and convincing." When we speak of clear and convincing evidence, we mean more than a preponderance of the evidence; we mean "evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Dortch,* 860 A.2d at 358 (quoting *In re T.J.,* 666 A.2d 1, 16 n. 17 (D.C.1995)). "A firm belief in a serious doubt" may sound like an oxymoron, but in fact there is nothing illogical or unusual about insisting on it. In most cases, it is the attorney's

---

28. We have urged the Board to "consider the possibility of expediting such procedures."

*Steele,* 630 A.2d at 201 n. 5; *see also id.* at 202 (Farrell, J., concurring).

misconduct, which does have to be proved by clear and convincing evidence, *see Anderson*, 778 A.2d at 335, that casts the requisite serious doubt on the attorney's fitness. If the misconduct that is established by clear and convincing evidence is not grave enough by itself to evoke such doubt, and Bar Counsel relies on other, aggravating facts to justify enhancing the sanction of suspension with a fitness requirement, we think the same standard of proof should apply to those aggravating facts as a matter of logic and fairness.

■ It is true that Bar Counsel ordinarily need not prove that a particular sanction, for example the precise length of a period of suspension, is justified by clear and convincing evidence. The difference here stems from our holding that the fitness requirement depends on a specific finding beyond the finding of a violation of the Rules. As *Anderson* itself illustrates, clear and convincing proof may be required when a finding of an aggravating fact is what determines whether a sanction enhancement will be imposed. The issue arose in *Anderson* in connection with the sanction for misappropriation of client funds, a violation of Rule 1.15(a). While negligent misappropriation typically merits a suspension of six months, reckless or intentional misappropriation almost always warrants disbarment. We held that even though the "level of culpability" is not part of the Rule violation, Bar Counsel must prove the mental state required for disbarment by clear and convincing evidence. 778 A.2d at 338. It is worth adding that, while a fitness requirement is not quite as severe an enhancement as disbarment, it comes close; as we have explained, it can transform a thirty-day suspension into one that lasts for years. That difference further persuades us, as we were persuaded in *Anderson*, that our law requires Bar Counsel to prove the facts that justify the enhancement with evidence that is clear and convincing.

The *Roundtree* factors will continue to be useful in determining whether a serious doubt arises as to an attorney's fitness, though we acknowledge that these factors are somewhat less useful where the attorney has failed to participate in the disciplinary inquiry. For the latter cases, the Board proposes to address the question of fitness by focusing on three factors: (1) the respondent's level of cooperation in the pending proceeding(s), (2) the repetitive nature of the respondent's lack of cooperation in disciplinary proceedings, and (3) "other evidence that may reflect on fitness." Bar Counsel questions the utility of this tripartite test and cites existing precedent, under which an attorney's deliberate failure to cooperate at all during the course of disciplinary proceedings has been held sufficient to justify both suspending the attorney and imposing a fitness requirement. *See, e.g., Mattingly*, 790 A.2d 579; *In re Giles*, 741 A.2d 1062 (D.C.1999); *Delaney*, 697 A.2d at 1213–14; *Lockie*, 649 A.2d at 547; *Siegel*, 635 A.2d at 346. (Less "egregious" disregard of the disciplinary process, on the other hand, has been found not to warrant a fitness requirement). *See Artis*, 883 A.2d at 96. Indeed, "[i]n circumstances where the respondent has repeatedly evinced indifference (or worse) toward the disciplinary procedures by which the Bar regulates itself, a requirement that the attorney prove fitness to resume practice is entirely reasonable." *Siegel, supra.* In and of itself, such behavior raises a serious question about the attorney's continuing capacity and willingness to fulfill his or her professional obligations. As we see it, the Board's approach to failure to cooperate cases is fully compatible with this principle. The Board simply has undertaken to adapt the *Roundtree* factors to the realities of such cases, and we find nothing

**26**

objectionable in its doing so. The relevance of the first two factors is undeniable, and the catchall third factor ensures that any other relevant facts will be taken into account.

### d. Respondent's Fitness to Practice

██ In accordance with D.C. Bar Rule XI, § 9(g), we adopt the Board's recommendation to condition respondent's reinstatement on proof of fitness. Even if we merely considered the three cases in which respondent has failed to respond to Bar Counsel's inquiries and the Board's orders, we would find a fitness requirement consistent with the dispositions in comparable cases and appropriate to the concerns raised by respondent's proven misconduct. As the Board states, the circumstances reveal a pattern of lack of cooperation in multiple proceedings over an eighteen month period. Coming after her appearances before the Hearing Committee in BDN 139–01, respondent's refusals to cooperate in BDN 372–01 and 428–01 indeed "constitute[d] an egregious disregard for the disciplinary process." [29] The Board appreciated that respondent had been through some personal hardship, but it noted that this did not prevent her from advising the Hearing Committee in BDN 139–01 of her circumstances. We agree with the Board that "[r]espondent's continuing reliance on the same personal hardship that formed the basis for the [Hearing] Committee's grant of a continuance ten months earlier [in BDN 139–01] cannot serve as a blanket protection from disciplinary sanction in BDN 372–01 and 428–01." The deliberate and unjustified disregard for the administration of justice exhibited by respondent causes us to entertain serious doubts as to her fitness to practice law.

We would add that the proven circumstances of respondent's misconduct in failing to supervise her secretary supply additional compelling reasons to doubt her present qualifications and competence to practice law. Several of the surrounding facts are particularly disturbing. It is troubling that so many months passed *after* Ms. Summers absconded before respondent discovered that over $40,000 was missing from the Morton Estate account. Respondent's written explanation for the delay, see footnote 5, *supra,* is hardly reassuring; on the contrary, it reveals inattention to her fiduciary duties bordering on paralysis, or even willful blindness, in the face of mounting evidence of serious problems with the account. For the same reasons, it is troubling that so many more months passed *after* the defalcations from the Morton Estate account were finally discovered before respondent discovered and reported that the Hinton Estate too had been invaded. A conscientious attorney in respondent's position would have checked the condition of all her other conservatorship accounts posthaste upon finding out that her secretary had embezzled funds from one of them. Lastly, we cannot ignore respondent's unexplained failure to appear at the hearing in BDN 337–

---

29. Thus, as the Board stated,

[t]he record reflects that Respondent received ample and repeated notice of the consolidated proceedings in BDN 372–01 and 428–01, that she understood that her failure to cooperate could result in suspension and a requirement to prove fitness, and that she made no effort to cooperate with Bar Counsel in the investigation of these two separate disciplinary charges or to participate in the hearings before Hearing Committee Four or the Board. Respondent's letters to Bar Counsel and our Executive Attorney make unreasonable demands, deny allegations about which she claims she is ignorant and fail to provide any cooperation as to either the underlying charges of misconduct or the specification of charges concerning her failure to cooperate.

99—a failure all the more significant because the hearing was rescheduled to accommodate respondent and enable her to participate. That she did not attend the rescheduled hearing is another clear indication that respondent lacked, and may still lack, the capacity to function as an effective and responsible attorney.

Taking all the warning signals into consideration, we have the most serious doubts about whether respondent will be fit to resume the practice of law at the end of her prescribed period of suspension. The evidence engendering those doubts is clear and convincing, and respondent has failed to refute it.

## III. CONCLUSION

For the foregoing reasons, respondent Rozan E. Cater is hereby suspended from the practice of law for 180 days, with reinstatement conditioned upon (1) respondent's full compliance with Bar Counsel's requests for information regarding the underlying complaints of misconduct in BDN 139–01, 372–01, and 428–01; (2) a satisfactory showing by respondent that she has been rehabilitated and is fit to practice law in the District of Columbia; and (3) proof that full restitution has been made to the Morton and Hinton Estates. Respondent's suspension shall become effective thirty days after the date of this opinion.

*So ordered.*[30]

---

30. Respondent's attention is directed to the requirements of D.C. Bar R. XI, § 14 (relating to disbarred and suspended attorneys) and § 16 (relating to eligibility for reinstatement).