*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-BG-0152

IN RE ABIGAIL ASKEW, RESPONDENT.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 497703)

On Report and Recommendation of the
Board on Professional Responsibility
(13-BD-238)

(Argued October 29, 2019                    Decided February 20, 2020)

*John O. Iweanoge, Jr.*, for respondent.

*Julia L. Porter*, Deputy Disciplinary Counsel, with whom *Hamilton P. Fox*, Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and WASHINGTON, *Senior Judge*.

PER CURIAM: On July 31, 2009, this court appointed respondent Abigail Askew to represent Purnell Jackson, an incarcerated indigent defendant, in the appeal from his conviction of a felony violation of the Bail Reform Act (Appeal No. 09-CF-0850). On June 19, 2013, we vacated respondent's appointment, finding that she had failed to file a brief and appendix on behalf of Mr. Jackson

despite successive orders by this court extending the time for filing, ignored this court's orders directing that the brief and appendix be filed, and failed to respond to a show-cause order as to why she should not be held in contempt for failure to file the brief and appendix or otherwise to comply with this court's orders. We referred the matter to the Office of Bar Counsel (now known as the Office of "Disciplinary Counsel," the term we use hereafter), which in October 2014 charged respondent with seven violations of the District of Columbia Rules of Professional Conduct: Rule 1.1(a) & (b) (failing to provide client with competent representation), Rule 1.3(a) (failing to provide zealous and diligent representation), Rule 1.4(a) (failing to keep client reasonably informed), Rule 1.4(b) (failing to explain matter to client to enable client to make informed decisions), Rule 3.4(c) (knowingly disobeying obligation under rules of a tribunal), and Rule 8.4(d) (engaging in conduct that seriously interferes with the administration of justice) in connection with her appointment to represent Mr. Jackson. A few months earlier (in July 2014), this court had sanctioned respondent for similar misconduct (violating all but one of the foregoing Rules) relating to another, similar matter. *See In re Askew*, 96 A.3d 52 (D.C. 2014) (per curiam) ("*Askew I*") (imposing a six-month suspension, with all but sixty days stayed, and a one-year probationary term, for neglect of imprisoned and indigent client Ronald Middleton).

In May 2016, an Ad Hoc Hearing Committee (the "Hearing Committee") found in the instant matter that Disciplinary Counsel proved all seven charged violations and recommended that respondent be suspended from the practice of law for six months and required to prove fitness before reinstatement to the bar. The Board on Professional Responsibility ("BPR") adopted the Hearing Committee's factual findings (including its credibility determinations) and conclusions of law and, in light of aggravating factors (respondent's failure to acknowledge fault in her handling of Mr. Jackson's case and what the Hearing Committee found to be several instances of respondent's deliberately false testimony before the Hearing Committee), also adopted the Hearing Committee's recommended sanction of a six-month suspension and a requirement to demonstrate fitness before reinstatement.

For the reasons that follow, we accept the Board's findings of fact and conclusions of law as to the Rules violations and agree with the recommended six-month suspension. However, we decline to impose a fitness requirement. Instead, we will require respondent to complete a practice management course and, after her suspension, to serve a one-year probationary period under the watch of a practice monitor.

**I.**

Respondent was the sole witness at her June 30, 2015, hearing before the Hearing Committee. Her testimony and the documentary evidence established the following facts, which are undisputed except as identified in the discussion that follows. Between July 31, 2009, and June 19, 2013, respondent made the following unsuccessful attempts to contact her client. In August 2009, she attempted to visit Mr. Jackson at the District of Columbia Jail, where she was informed that he had been transferred to a federal institution. Respondent then performed a Bureau of Prisons search, which traced Mr. Jackson to a federal facility in Petersburg, Virginia. Respondent thereafter wrote three letters to Mr. Jackson. She sent the first letter in August 2009, and the letter was not returned to her, but she received no response. Respondent sent a second letter to Mr. Jackson in either December 2009 or January 2010. She testified that after sending the second letter, she "attempted to contact his facility to try to talk to him." Specifically, she testified, she spoke "at least once" with a Petersburg facility counselor — whose name respondent did not recall — who informed respondent

that he would speak with Mr. Jackson about respondent's efforts to contact him.[1] Respondent did not schedule a time to speak with Mr. Jackson, and she had no record of her call to the counselor.

Respondent testified that she did not have copies of the letters she sent to Mr. Jackson because she lost "all of her prior electronic information" because of a computer virus she experienced in May 2011.[2] She further testified that, in early 2011, approximately one year after she wrote the second letter to Mr. Jackson, she received a phone call from a "young lady," who would not identify herself but who stated that Mr. Jackson wanted to know why respondent was "trying to get in touch with him." Respondent explained to the caller that she had been appointed to represent Mr. Jackson. Respondent took the phone call as an indication that Mr. Jackson "had to have gotten [respondent's] letter[,]" because that was "the only way [the caller] could have gotten [respondent's contact] information to call [respondent] on his behalf." Respondent thought she was "going to be hearing from [Mr. Jackson] based on the phone call."

---

[1] The Hearing Committee found that respondent's testimony about her attempt to contact a counselor at Mr. Jackson's federal institution was uncorroborated, implausible, and deliberately false.

[2] The Hearing Committee found that respondent's testimony regarding her retention of hard-copy documents was inconsistent with her testimony in *Askew I.*

On June 28, 2011, respondent wrote a third letter to Mr. Jackson addressed to the federal correctional institution in Petersburg, but the letter was returned to respondent (and was first opened during the disciplinary hearing).[3] Upon receiving the returned letter, respondent, thinking that Mr. Jackson might have been transferred to another facility, conducted another Bureau of Prisons search and spoke to someone at the Bureau of Prisons, but did not locate Mr. Jackson. At some point in July or August 2011, Ms. Askew made inquiries to this court's Legal Division about hiring an investigator to assist in locating Mr. Jackson; she was informed that this court would not cover the cost of hiring an investigator in the situation respondent described. Respondent did not move the court for permission to hire an investigator and did not inquire of anyone more experienced than she (such as the Public Defender Service or the U.S. Attorney's Office) about what to do when she could not locate her client.

On December 8, 2011, respondent filed a motion to dismiss Mr. Jackson's appeal without prejudice, on the ground that she was unable to contact the client.

---

[3] The Hearing Committee specifically credited respondent's testimony that she wrote three letters to Mr. Jackson, because the testimony was corroborated by her motion filings and by the third letter, which respondent produced at her hearing.

On December 28, 2011, this court denied the motion without prejudice to renewal of the motion after a more complete search, which this court advised should include "contacting [the] U.S. Parole [C]ommission since appellant is subject to three years of supervised release." Subsequently, between January and September of 2012, respondent contacted CSOSA (the Court Services and Offender Supervision Agency), identified Mr. Jackson's supervisory officer and left telephone messages for her and her supervisor, and sent a letter, but never made contact.

The documentary evidence presented at the hearing established that, over the nearly four years that respondent represented Mr. Jackson, she responded late or not at all to several of this court's orders. She responded late to orders issued on June 29, 2011 (directing that the brief and appendix be filed by July 18; motion for extension of time not filed until July 21); June 22, 2012; July 27, 2012 (directing that the brief and appendix be filed by September 10; motion for extension of time not stamped filed until September 12)[4]; October 3, 2012 (directing that the brief

---

[4] Respondent contends that she did not in fact respond late to the court order issued on July 27, 2019. She testified that she filed a motion in response to this order on September 10, 2012, the day it was due, and points to the fact that her filing bears stamps indicating both a September 10, 2012, date of receipt and a September 12, 2012, date of receipt. The Hearing Committee found this testimony
(continued…)

and appendix be filed by December 3; motion for extension of time not filed until December 6) and March 1, 2013 (directing that the brief and appendix be filed within 15 days; motion for extension of time not filed until 17 days later). Respondent failed to respond to court orders issued on July 31, 2009 (requiring respondent to file a statement regarding transcripts); October 21, 2010 (directing that the brief and appendix be filed within 40 days); March 7, 2011 (directing that the brief and appendix be filed by March 30); April 5, 2011 (directing that the brief and appendix be filed within 20 days); August 1, 2011 (directing that the brief and appendix be filed by September 16); October 5, 2011 (directing that the brief and appendix be filed within 15 days); November 22, 2011 (directing that the brief and appendix be filed within 10 days); February 28, 2012 (directing that the brief and appendix be filed within 40 days); April 17, 2012 (directing that the brief and appendix be filed within 20 days); May 18, 2012 (directing that the brief and appendix be filed within 15 days); July 27, 2012 (directing that the brief and appendix be filed by September 10); September 12, 2012 (directing that the brief and appendix be filed within 15 days); December 14, 2012 (directing that the brief and appendix be filed by February 4, 2013); and March 26, 2013 (directing that the brief and appendix be filed by April 1, 2013).

_____

(…continued)
to be deliberately false and "an attempt to capitalize on a [c]ourt date-stamping error."

With regard to her failure to respond and late responses to court orders, respondent testified that she "had a lot of trouble with . . . mail" addressed to her at her virtual office at 1629 K Street.[5]  She testified that her mail was sometimes returned without her knowing it, and that by the time she received some of the court's orders, "they were beyond their deadlines."  She testified that she made arrangements to have her mail forwarded from her office to a P.O. Box address near her home in Bowie, Maryland to try to address the problem.[6]  She explained that she could not file a brief in response to the court's orders because she needed first "to talk to Mr. Jackson or have some type of communication with him[.]"

On June 19, 2013, upon Ms. Askew's failure to respond to this court's March 26, 2013, order, we issued an order vacating her appointment and appointing replacement counsel for Mr. Jackson.  The court furnished a copy of

---

[5]  The Hearing Committee found that respondent's testimony regarding mail issues did "not ring true" and was deliberately false.

[6]  In January 2013, respondent informed this court that she would henceforth be using her P.O. Box address.  Respondent testified that she did not receive the court orders filed on August 1, 2011; October 5, 2011; February 28, 2012; and March 26, 2013.  Two of the orders that were addressed to her office address — the April 17, 2012, and May 18, 2012, orders — were returned to the court as undeliverable.  However, the court orders dated August 1, 2011; October 5, 2011; February 28, 2012; and March 26, 2013 were not returned by the Post Office.

this order to Mr. Jackson at Fort Dix. Within five months of his appointment, replacement counsel was able to locate Mr. Jackson and communicate with him. On November 27, 2013, replacement counsel filed a motion to dismiss the appeal accompanied by a statement signed by Mr. Jackson waiving his right to appeal, and this court granted that motion.

On June 30, 2015, the Hearing Committee issued its Report and Recommendation, rejecting respondent's contention that she had done "everything [she] could in this case" and finding that Disciplinary Counsel had proven all seven charged violations. The Hearing Committee also found that the record was "replete" with testimony (the testimony mentioned in notes 1, 2, 4, 5, and 6 *supra*, as well as testimony relating to when respondent received the order terminating both her representation of Mr. Middleton and her membership in the Criminal Justice Act ("CJA") panel) "that either rings false or was otherwise contradicted by the evidence." The Hearing Committee emphasized that, in *Askew I*, respondent "violated the same Disciplinary Rules charged in the instant matter."

The Board issued its Report and Recommendation on February 9, 2017, incorporating by reference the Hearing Committee's Report and adopting the Hearing Committee's recommendations.

**II.**

This court reviews *de novo* the Board's legal conclusions. *In re Szymkowicz*, 195 A.3d 785, 788 (D.C. 2018) (per curiam). We accept "findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C. Bar R. XI, § 9(h)(1); *In re Johnson*, 103 A.3d 194, 197 (D.C. 2014).[7] We also give deference to the Board's recommended disposition unless doing so "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1); *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam). "Ultimately, however, . . . the imposition of sanctions[] is the responsibility and duty of this court." *In re Haar*, 698 A.2d 412, 423 (D.C. 1997). The final decision on sanctions is "committed to this Court's discretion." *In re Dickens*, 174 A.3d 283, 296 (D.C. 2017).

---

[7] The Board must defer to the factual findings of the Hearing Committee so long as those findings are supported by substantial evidence. *In re Cleaver-Bascombe*, 986 A.2d 1191, 1194 (D.C. 2010) (per curiam).

## III.

We have no difficulty sustaining the Board's conclusion that respondent violated each of the Rules cited in the Specification of Charges.

### A. Rules 1.1(a) and (b)

Rule 1.1(a) provides that "a lawyer shall provide competent representation to a client." D.C. Bar Appx. A, Rule 1.1(a). "Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." *Id.* Rule 1.1(b) provides that "a lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." D.C. Bar Appx. A, Rule 1.1(b). These rules address failures that constitute a "serious deficiency" in an attorney's representation of a client. *In re Yelverton*, 105 A.3d 413, 421–22 (D.C. 2014). "Mere careless errors do not rise to the level of incompetence." *In re Evans*, 902 A.2d 56, 70 (D.C. 2006) (per curiam).

Respondent argues that her failure to locate her client does not constitute a Rule 1.1 violation because there was no prejudice to Mr. Jackson. She also contends that her inability to locate her client was a mere careless error that did not rise to the threshold of serious deficiency. We do not agree. A serious deficiency "has generally been found in cases where the attorney makes an error that prejudices *or could have prejudiced a client and the error was caused by a lack of competence*." *Yelverton*, 105 A.3d at 422 (emphasis added). Because actual prejudice is not required, a fortuitous lack of injury to the client does not shield a respondent from discipline in response to her neglect of her professional obligations. *In re Speights*, 173 A.3d 96, 101 (D.C. 2017) (per curiam). Here, respondent's failure to successfully make contact with Mr. Jackson over the span of approximately four years could have prejudiced him by putting his appellate rights in jeopardy. Further, respondent's meager and lackadaisical efforts to find her client over a four-year period cannot fairly be characterized as merely careless. To illustrate, respondent either knew or should have known, from the docket sheet in Mr. Jackson's Bail Reform Act case, that Mr. Jackson, who in September 2008 had been committed pending disposition, had received a sentence of sixteen months' imprisonment and three years of supervised release; and that, by January 2010, there was at least a possibility that he was on supervised release and might be found through a CSOSA supervisory office. Respondent's failure to recognize

this possibility until she received advice from this court when her motion to dismiss the appeal was denied, evinced a failure to familiarize herself with the record, which sounds in incompetence rather than mere carelessness.[8]  In addition, respondent's "dropping of the ball in a litigation matter through unexcused failure to make required filings . . . unquestionably violate[d] Rule 1.1." *In re Sumner*, 665 A.2d 986, 989 (D.C. 1995).

## B. Rule 1.3(a)

Rule 1.3(a) states that an attorney "shall represent a client zealously and diligently within the bounds of the law." D.C. Bar Appx. A, Rule 1.3(a); *Speights*,

---

[8]  Respondent also makes the curious argument that Rule 1.1 violations arise only where an attorney makes a single error, rather than an aggregation of errors, and where there was also evidence that the attorney was inexperienced.  But the fact that respondent Askew was an experienced attorney (although she was new to the CJA panel, having joined it in 2008 or 2009, she testified that she worked for over six years as a prosecutor in the Cook County State's Attorney's Office after being admitted to the Illinois bar in 2000) and the fact that she persisted in her deficient conduct, did not diminish her obligations under Rule 1.1. *See, e.g., In re Mance*, 869 A.2d 339, 341 n.8 (D.C. 2005) (per curiam) ("well-respected" defense attorney sanctioned for Rule 1.1 violation); *In re Drew*, 693 A.2d 1127 (D.C. 1997) (per curiam) (suspending attorney for Rule 1.1(a) and (b) violations in the course of representing two defendants in separate criminal appeals); *In re Douglass*, 745 A.2d 307 (D.C. 2000) (per curiam) (publically censuring an attorney for violating several rules, including Rule 1.1, in connection to various aspects of probate representation).

173 A.3d at 135. We have interpreted this Rule to prohibit a failure to act for a "significant time to further a client's cause" independently of whether the client is ultimately prejudiced by the delay. *In re Starnes*, 829 A.2d 488, 503-4 (D.C. 2003) (per curiam). "Neglect of client matters is a serious violation of the obligation of diligence." D.C. Bar Appx. A, Rule 1.3, Comment 8.

Respondent's failure to make contact with her client and file a brief on his behalf for a period of approximately four years clearly implicates Rule 1.3(a).[9] As the Hearing Committee emphasized, respondent "took only sporadic action to locate and communicate with" Mr. Jackson, "waiting several months (and at one point approximately a year) between action steps." There also was no evidence that respondent attempted to make an in-person visit to Mr. Jackson's supervisory officer when respondent's efforts at telephone and letter contact failed (even though, we take notice, the CSOSA office is located near the courthouse), and no evidence that respondent asked Mr. Jackson's trial counsel, the Assistant United States Attorney who had been assigned to this case, or this court's Clerk's Office for assistance in locating Mr. Jackson. The Board's finding that respondent failed

---

[9] Respondent testified that she reviewed Mr. Jackson's trial transcripts, performed research, and drafted a brief, but acknowledged that she could not produce any hard copy of a draft brief that she had prepared for his appeal.

to act with diligence and zeal in representing Mr. Jackson is supported by substantial evidence.

### C. Rules 1.4(a) and 1.4(b)[10]

Rule 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." D.C. Bar Appx. A, Rule 1.4(a). Rule 1.4(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." D.C. Bar Appx. A, Rule 1.4(b). "To meet that expectation, a lawyer not only must respond to client inquiries but also must initiate communications to provide information when needed." *In re Hallmark*, 831 A.2d 366, 374 (D.C. 2003). Further, an attorney must make more than a *pro forma* attempt to initiate communications. *See In re Geno*, 997 A.2d 692, 693 (D.C. 2010) (per curiam) (holding that "a few phone calls and one letter sent on the eve of the hearing" were insufficient to satisfy Rule 1.4). Here, respondent failed to communicate with Mr. Jackson for approximately

---

[10] Respondent's brief asserts that she did not violate rule 1.4(h). Given that there is no Rule 1.4(h) and that respondent was not charged with violating Rule 1.4(h), we interpret respondent's statements as assertions that she did not violate Rule 1.4(b).

four years, never actually having an exchange with him during the period of her appointment to represent him. Her attempts to contact her client were perfunctory, at best, and fell short of her ethical duties under Rules 1.4(a) and (b).

### D. Rule 3.4(c)

Pursuant to Rule 3.4, a lawyer shall not "[k]nowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." D.C. Bar Appx. A, Rule 3.4(c). We have previously recognized that a failure to meet filing deadlines can violate Rule 3.4. *See In re Murdter*, 131 A.3d 355, 356 (D.C. 2016) (per curiam) (holding that attorney's failure to "file appellate briefs for convicted indigent defendants he was appointed to represent or respond to numerous orders in connection therewith" constituted a violation of Rule 3.4). Respondent emphasizes that she could not file a brief until she had made contact with Mr. Jackson. Nevertheless, she remained under an obligation to respond to, and not simply ignore, court orders.[11] The evidence shows that respondent responded late, or did not respond at all, to court orders at least sixteen times in this case, not counting the two orders that were returned to

---

[11] Respondent first informed this court that she was experiencing difficulties in contacting her client in a motion filed February 2011, approximately nineteen months after she was appointed.

the court as undeliverable. We agree with the Board that Ms. Askew's repeated disregard of court orders constitutes a violation of Rule 3.4(c).

In taking exception to the finding of a Rule 3.4(c) violation, respondent contends that she reasonably believed she was absolved of any responsibilities towards Mr. Jackson as of January 2013, which was when she testified that she became aware of this court's September 27, 2011, order entered in *Middleton* that removed her from the CJA panel. The Hearing Committee rejected respondent's claim, finding that she remained counsel of record in *Jackson* until this court vacated her appointment on June 19, 2013, and noting that respondent turned over the *Middleton* file to replacement counsel *before* January 2013 (supporting an inference that respondent knew of the *Middleton* order before that time). In addition, despite respondent's claim that she believed the *Middleton* order removed her from *Jackson*, she submitted a motion to extend time in *Jackson* even after the date she identified as the date when she received the *Middleton* order. As already noted, the Committee found that respondent's testimony regarding the *Middleton* order was deliberately false.

**E. Rule 8.4(d)**

Rule 8.4 provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that seriously interferes with the administration of justice." D.C. Bar Appx. A, Rule 8.4(d). An attorney violates Rule 8.4(d) when her improper conduct causes an unnecessary expenditure of time and resources that taints a judicial proceeding in more than a *de minimis* way. *See In re Cole*, 967 A.2d 1264, 1266 (D.C. 2009).

Respondent's repeated and unexplained failures to comply with court orders delayed a resolution in Mr. Jackson's case. Furthermore, because of respondent's misconduct, the court had to appoint replacement counsel for Mr. Jackson. Respondent's conduct is precisely the type of conduct that we have often held violated Rule 8.4. *See In re Ukwu*, 926 A.2d 1106, 1142-43 (D.C. 2007) (holding that an attorney's failure to file a brief by the due date set by the court, when the attorney had previously stated his intention to file a brief, violated Rule 8.4(d)); *In re Toppelberg*, 906 A.2d 881 (D.C. 2006) (per curiam) (suspending attorney who failed to comply with a court order for a Rule 8.4 violation).

**IV.**

The purpose of imposing attorney discipline is not to punish the attorney, but rather to serve the interests of the public and of the profession. *Cleaver-Bascombe*, 986 A.2d at 1199. In determining what sanction to impose, this court reviews a respondent's violations in light of all the relevant factors, which generally include "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *In re Ekekwe-Kauffman*, 210 A.3d 775, 797 (D.C. 2019) (per curiam). In addressing the fourth of these factors, we simply restate that the Hearing Committee and Board found, and we agree, that respondent's conduct discussed herein violated seven of the Rules of Professional Conduct. We address each of the other factors below (departing somewhat from the order in which they are listed in *Ekekwe-Kauffman*).

As to the first of the foregoing factors, respondent's neglect of Mr. Jackson's case was serious misconduct. Her failure to fulfill her obligations as a CJA attorney undermines the Criminal Justice Act's aim "to provide indigent defendants with not just the mere formal appointment of someone who happens to be a lawyer but more critically legal assistance that is reasonably diligent, conscientious and competent," and "reflects negatively on both this court and the

legal profession." *Askew I*, 96 A.3d at 60 (internal quotation marks omitted). And as to prejudice, the second factor, even though Mr. Jackson did ultimately decide to forgo his appeal, it is possible that if he had had the benefit of the advice of counsel during that four-year period, he might have decided not to waive his appeal rights.

Focusing on her disciplinary history, the fifth factor, respondent urges us to impose no more than a probationary sanction, asserting that the sanction imposed in *Askew I* "was calculated to address the violations" in issue in the instant case. In other words, she argues that she has already been disciplined for the conduct involved here. We cannot agree. In our opinion in *Askew I*, we did allude to the fact that respondent "failed to file the brief and respond to court order" in "one other criminal case [*Jackson*]," in order to explain that the conduct involved in *Askew I* was not "aberration[al]." *Askew I*, 96 A.3d at 61. However, contrary to respondent's claim that the relevant "facts were known by the Court of Appeals when it imposed sanction in *Askew I*," all the relevant facts of *Jackson* were not before the court in *Askew I*. As the Board correctly concluded, the passing reference to the instant matter in *Askew I* "does not evidence a full understanding by the [c]ourt of the facts of this case."

We do agree with respondent, however, that the time periods involved in *Askew I* and the instant case overlapped and that the violations involved here "occurred at approximately the same period of time" as the violations sanctioned in *Askew I*. Respondent was appointed to represent Mr. Jackson almost a year before she was appointed to represent Mr. Middleton. Her initial efforts to contact Mr. Jackson by letter in August 2009 and December 2009 or January 2010 predated her appointment to represent Mr. Middleton in June 2010. Respondent sent a third letter to Mr. Jackson in June 2011, months before this court vacated respondent's appointment to represent Mr. Middleton in September 2011, *see Askew I*, 96 A.3d at 57, and months before Disciplinary Counsel opened its investigation into respondent's conduct in Mr. Middleton's case in October 2011, *id.* at 58. Respondent should have known that her attempts to contact Mr. Jackson were inadequate. However, we cannot say that the disciplinary action initiated based on respondent's conduct in representing Mr. Middleton, or this court's response to respondent's lack of diligence and neglect of Mr. Middleton, did anything to caution respondent against Rules violations during the first two years of her appointment to represent Mr. Jackson.

Respondent's actions after the fall of 2011 included a motion to dismiss Mr. Jackson's appeal without prejudice and efforts over the next year to obtain

information from CSOSA. Neither approach was adequate to the situation, but both approaches were different from the mere letter-writing to Mr. Jackson at federal institutions that had followed respondent's learning that he was not housed in the D.C. Jail. On this record, we cannot say that respondent learned nothing from the disciplinary action that was initiated based on her misconduct in handling the *Middleton* case. Thus, we do not agree with the Hearing Committee that respondent "did nothing to bring herself into compliance" with her ethical obligations. And even though, as the Hearing Committee correctly observed, respondent's "misconduct in the instant matter extended over a longer period of time [than the *Middleton* matter that formed the basis for her discipline in *Askew I*] (four years vs. 18 months)," respondent did not repeat the willful neglect — i.e., respondent's "actively ignor[ing] both [the client] and the family members who reached out to [respondent] on his behalf," *Askew I*, 96 A.3d at 59, 60 — for which we sanctioned her in *Askew I*.

The disciplinary action and termination-of-appointment in *Middleton* should have reminded respondent of the importance of responding timely to court orders. But in sanctioning respondent in *Askew I* in July 2014 — which came after we had vacated respondent's appointment to represent Mr. Jackson — we said that the 60-day suspension we imposed would give her time to restructure her practice to

ensure adequate mail delivery, so as to correct the problem that respondent blamed for missing court orders. 96 A.3d at 62. We do not think it appropriate to sanction respondent additionally for her untimely responses to court orders during a period that pre-dates the corrective-action period we prescribed.

In light of all the foregoing, we will not treat respondent's disciplinary history as an aggravating factor; rather (and on this we agree with the Hearing Committee and the Board), we think it is appropriate to consider respondent's violations in this case as if they were before the Board simultaneously with the violations sanctioned in *Askew I*. The Hearing Committee read our previous cases to set a "baseline" of a six-month suspension for the neglect of indigent criminal defendants.[12] That is a fair assessment, although in a number of cases we have imposed only a three-month suspension for neglect of client matters and failure to communicate with the client.[13] The Hearing Committee and the Board, reasoning

---

[12] *See In re Murdter*, 131 A.3d at 356 (imposing six-month suspension, all but sixty days stayed); *Askew I*, 96 A.3d at 62 (imposing six-month suspension, all but sixty days stayed); *In re Rosen*, 470 A.2d 292, 293 (D.C. 1983) (imposing six-month suspension for neglect and intentional failure to carry out client's objectives in court-appointed representation); *In re Whitlock*, 441 A.2d 989, 992 (D.C. 1982) (imposing six-month suspension for neglect of court-appointed clients).

[13] *See, e.g.*, *In re Alexander*, 466 A.2d 447 (D.C. 1983) (suspending the respondent for a period of three months for gross and willful neglect of two client matters); *In re Knox*, 441 A.2d 265 (D.C. 1982) (three-month suspension for

(continued…)

that a year's suspension would have been the appropriate sanction for respondent's misconduct in the *Middleton* and *Jackson* matters taken together, recommended a six-month suspension in this case on the ground that a six-month suspension (with all but 60 days stayed) was already imposed in *Askew I.* "[C]onsistency with other dispositions [might] call[] for imposition of [only] *one* six-month suspension for respondent's conduct involved in both proceedings." *Whitlock*, 441 A.2d at 990. But because most of the six-month suspension we imposed in *Askew I* was stayed, we accept the Board's recommendation of a six-month suspension.

An additional basis for accepting the Board's recommendation of a six-month suspension rather than imposing a three-month suspension relates to the fourth factor that we consider when determining what sanction to impose: whether the respondent's conduct involved dishonesty. As already described, the Hearing Committee identified seven instances of what it found to be deliberately false testimony by respondent. While a three-month suspension might otherwise be appropriate for respondent's neglect of the matter for Mr. Jackson, see *supra* note

---

(…continued)
respondent's failure to pursue client's personal injury and worker's compensation claims over a period of years).

13, we deem a three-month suspension to be inadequate in light of respondent's deliberately false statements to the Hearing Committee.

The sixth factor we consider is whether the attorney has acknowledged her wrongful conduct. The Board highlighted respondent's continued insistence that she did everything she could to contact Mr. Jackson and her failure to express remorse and to acknowledge her misconduct. In our view, however, the record shows a lack of competence (e.g., it appears that the various means a competent attorney would have used to locate her client never occurred to respondent, even by the date of the hearing) rather than an unwillingness to express remorse or acknowledge misconduct. We highlight respondent's statement that she "d[id not] know any other way to have done it [i.e. to have contacted Mr. Jackson]," as well as her failure to comprehend how to fulfill her obligations when her lack of success in reaching the client conflicted with the filing deadlines set by the court.

Finally, as to the seventh factor, the record does not suggest any mitigating circumstances, such as an emotional or mental condition underlying the

misconduct involved here,[14] that should cause us to shorten or stay the suspension we have determined is the appropriate sanction.

The Board recommended that we impose a fitness requirement, explaining that "a significant factor" in its determination that a fitness requirement is appropriate was the Hearing Committee's finding that respondent deliberately testified falsely about her conduct. To be sure, deliberately false testimony is an aggravating factor, and we have treated it as such in adopting the recommendation of a six-month suspension.[15] But, as we have explained, a determination that a substantial sanction is warranted is not necessarily sufficient to justify a fitness requirement. *In re Cater*, 887 A.2d 1, 22 (D.C. 2005). The reason for imposing a proof-of-fitness requirement is "conceptually different from the reason for suspending a respondent for a period of time." *Id.* In contrast to a suspension, which is "intended to serve as the commensurate response to the attorney's past ethical misconduct, . . . [an] open-ended fitness requirement is intended to be an

---

[14] *Cf. In re Adams,* 191 A.3d 1114, 1117 (D.C. 2018).

[15] *See, e.g., Cleaver-Bascombe*, 892 A.2d at 413 (recognizing that a respondent's deliberately false testimony in a disciplinary proceeding is "a significant aggravating factor"); *In re Corizzi*, 803 A.2d 438, 442-43 (D.C. 2002) (indicating that dishonest conduct including false statements made to Bar Counsel during investigation was an aggravating factor).

appropriate response to serious concerns about whether the attorney will act ethically and competently in the future, after the period of suspension has run." *Id.* "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Ditton*, 980 A.2d 1170, 1174 (D.C. 2009) (brackets and internal quotation marks omitted). "[T]he term 'doubt' . . . connote[s] real skepticism, not 'just a lack of certainty.'" *Cater*, 887 A.2d at 24. This court's primary "concern is that [a respondent's] resumption of the practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." *Id.* at 22 (internal quotation marks and brackets omitted).

We said in *Askew I* that the record, which suggested respondent's "fundamental failure to understand her duties as court-appointed counsel," 96 A.3d at 61, warranted a period of suspension and probation, but no fitness requirement. The instant case involves that same, largely contemporaneous, fundamental failure by respondent to understand her duties as court-appointed counsel. But nothing in the current record gives us *more* "real skepticism" about respondent's fitness to

practice law than we had when we decided *Askew I*.[16] *Cater*, 887 A.2d at 24. It is true that in *Askew I*, we did not have a finding by the Hearing Committee that respondent's testimony was deliberately dishonest; but we did "disagree that certain points of Ms. Askew's questionable testimony [could] be attributed to [mere] 'confusion.'" *Askew I*, 96 A.3d at 60. In addition, taking a step beyond the Hearing Committee's assessment that there were "contradictions" between some of respondents' factual assertions, we observed that some of her assertions "lack[ed] the ring of truth even if they had been made in the first instance." *Id.* Not having imposed a fitness requirement on the record in *Askew I* (which, like the record here, contained questionable assertions about respondent's "difficulties receiving mail," 96 A.3d at 58; about a telephone call she placed to a federal prison, *id.* at 55 n.2; and about her non-retention of hard copies of documents, *id.* at 56 n.7, and additionally involved respondent's affirmative neglect of her client's and his family's efforts to contact her), we discern no compelling reason to impose one

---

[16] In *Askew I*, we did express our "ongoing concern as to Ms. Askew's ability to adequately fulfill her duties as a lawyer" because she had not set up a consistent and reliable method of receiving her mail, which we observed is "a fundamental element of legal practice." *In re Askew*, 96 A.3d at 59. To the extent that the violations involved in this case stemmed from mail problems, they were from the same time period as was involved in *Askew I*. There is no evidence that respondent failed to address those problems during her suspension, which we said "should give her the time she needs." 96 A.3d at 62. Accordingly, we do not have that same worry about respondent's ability to adequately fulfill her duties as a lawyer.

here.[17] We also think a requirement that respondent take a practice management course and work under the eye of a practice monitor during a probationary period, rather than a fitness requirement, is appropriate here.

We therefore order that Abigail Askew is suspended from the practice of law in the District of Columbia for a period of six months,[18] during which time she shall complete a practice management course approved by Disciplinary Counsel,

---

[17] We note that we have not always imposed a fitness requirement on the basis of a respondent's deliberately false statements to the Hearing Committee. *See, e.g.*, *In re Chapman*, 962 A.2d 922 (D.C. 2009) (imposing a sixty-day suspension, with thirty days stayed in favor of a one-year period of probation and certain CLE courses, but no fitness requirement, where respondent neglected his client's case, resulting in her case being dismissed, had a minor disciplinary history, showed a lack of remorse for the harm caused to the client, and "was found to be deliberately dishonest in his dealings with Bar Counsel and not credible in his testimony before the [Hearing] Committee"); *In re Washington*, 489 A.2d 452, 461 (D.C. 1985) (three-month suspension for respondent's neglect of a client matter; no fitness requirement despite the fact that the attorney gave "frivolous" testimony and proffered explanations that "strain[ed] . . . credulity"); *Alexander*, 466 A.2d at 451-52 (suspending the respondent for a period of three months for gross and willful neglect of two client matters; no fitness requirement despite the Board's rejection of respondent's "dissembling excuses" and fact that respondent had previously been informally admonished three times for neglecting a client's affairs).

[18] Disciplinary Counsel advised us at oral argument that, in the wake of this court's August 17, 2017, order suspending her on an interim basis, respondent has yet to file the affidavit as required under D.C. Bar R. XI, § 14(g), that would mark the commencement of the period of suspension.

and after which she shall serve a probationary period of one-year under the watch of a practice monitor.  It is

*So ordered.*